# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Johnson,<br><br>  Plaintiff,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>  Defendants. | No. CV 18-03055-PHX-MTL (ESW)<br><br>**ORDER** |

Plaintiff Richard Johnson, who is currently confined in Arizona State Prison Complex-Eyman, brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 37.) The parties cross-move for summary judgment. (Docs. 55, 57.)[1]

**I.    Background**

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Fourteenth Amendment Due Process claims against Defendants Ryan, Crabtree, Days, and Montano and First Amendment retaliation claims against Defendants Belt and Montano. (Docs. 9, 26.) The Court dismissed the remaining claims and Defendants. (Doc. 9.)

**II.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) regarding the requirements of a response to Defendants' Motion for Summary Judgment. (Doc. 62.)

movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III. Facts**

    **A. The Security Threat Group Program**

In 1991, the Arizona Department of Corrections (ADC) established a Security Threat Group (STG) policy dedicated to controlling prison gang activity in Arizona's prisons. (Doc. 58 ¶ 1; Doc. 70 ¶ 1.) A reduction in prison gang membership and activities contributes to the decrease of violence, intimidation, and harassment of other inmates. (Doc. 58 ¶ 1; Doc. 70 ¶ 1.) The purpose of the STG policy is to minimize the threat that

inmate-gang or gang-like activity poses to the safe, secure, and orderly operations of institutions. (Doc. 58 ¶ 2; Doc. 70 ¶ 2.) Information is gathered by the Special Security Unit (SSU) about inmates suspected of being in a STG; when enough information is collected, a validation packet is put together, and a hearing is held. (Doc. 58 ¶ 3; Doc. 70 ¶ 3.) If successfully validated as an STG-member, the validated inmate is classified as a maximum custody inmate. (Doc. 58 ¶ 3; Doc. 70 ¶ 3.) Once validated, an inmate can only have his custody reduced from maximum custody if he renounces his STG membership and debriefs or successfully completes the Step-Down Program. (Doc. 58 ¶ 4; Doc. 70 ¶ 4.) The Step-Down Program does not require renunciation and debriefing; as a result, any indication that the inmate is involved in gang activity results in removal from the Step-Down Program because the absence of gang activity is the primary requirement of remaining in the Step-Down Program. (Doc. 58 ¶ 5; Doc. 70 ¶ 5.) Inmates are permitted to renounce and debrief at any time. (Doc. 58 ¶ 6; Doc. 70 ¶ 6.)

To participate in the Step-Down Program, a validated STG-member notifies staff in writing that he wants to participate in the Step-Down Program. (Doc. 58 ¶ 7; Doc. 70 ¶ 7.) To be eligible, the inmate must successfully complete a 24-month period where he has not participated in any documented STG/gang activity or other behaviors, including, but not limited to, assaultive or violent behavior and drug use or possession. (Doc. 58 ¶ 8; Doc. 70 ¶ 8.) The inmate must also successfully complete a polygraph examination that is specific in nature concerning the inmate's intent of participating in the program. (Doc. 58 ¶ 9; Doc. 70 ¶ 9.) The inmates are screened by the SSU and STG Unit to determine if they meet criteria to enroll in the program. (Doc. 58 ¶ 10; Doc. 70 ¶ 10.)

A comprehensive investigation of each validated STG inmate is completed to assess the inmate's STG involvement. (Doc. 58 ¶ 10; Doc. 70 ¶ 10.) Validated STG inmates must successfully complete the Step-Down Program to be eligible to reintegrate into close custody institutions; their behavior must demonstrate that they do not pose a threat to staff, inmates, or the safe, secure and orderly operations of the institution. (Doc. 58 ¶ 11; Doc.

70 ¶ 11.) The Step-Down Program must be completed within 18 months of the date of entry into the Program. (Doc. 58 ¶ 12; Doc. 70 ¶ 12.)

If the inmate successfully completes the 18-month program and passes a polygraph, the inmate then becomes eligible for close custody. (Doc. 58 ¶ 13; Doc. 70 ¶ 13.) After a successful transition to the Close Custody Unit, the inmate remains under an indefinite period of monitoring for Step-Down inmates. (Doc. 58 ¶ 14; Doc. 70 ¶ 14.) ADC policy states that inmates enrolled in the Step-Down Program must be removed if they violate criteria outlined in the policy or if they fail a polygraph; the rationale for the removal must be documented in an Information Report. (Doc. 58 ¶¶ 15-16; Doc. 70 ¶¶ 15-16.) Upon removal from the Step-Down Program, the Deputy Warden of the inmate's assigned housing unit must review the circumstances of the removal and determine whether to reinstate or terminate the inmate from the Step-Down Program. (Doc. 58 ¶¶ 16-17; Doc. 70 ¶¶ 16-17.) A disciplinary ticket, a disciplinary investigation, or utilizing a Form A is not necessary to remove an inmate from the Step-Down Program. (Doc. 58 ¶ 18; Doc. 70 ¶ 18.) At the time of Plaintiff's removal from the Step-Down Program, inmates in Phases I-IV of the Step-Down Program were not entitled to have Revocation hearings prior to their removal from the program and did not have the ability to appeal their removal to the STG Appeals Committee, but the Inmate Grievance Procedure remained available.[2] (Doc. 58 ¶¶ 19-20; Doc. 70 ¶ 19.)

Inmates who are removed from the Step-Down Program due to direct involvement in STG activity or for any reason deemed appropriate by the STG Validation Hearing Committee during the inmate's placement in the program shall be required to serve a minimum of two years under validated status before they are eligible to participate in the program. (Doc. 58 ¶ 21; Doc. 70 ¶ 21.) Inmates are given two opportunities to participate in the Step-Down Program, but if removed from the program two times, inmates become

---

[2] Plaintiff asserts that Department Order (DO) 802 was not available because DO 806 does not serve as a duplicate appeal process or substitute appeal process for DO 806. (Doc. 70 ¶ 20.)

permanently ineligible from participating in the program, and inmates remain in validated status unless they choose to participate in the debrief process. (Doc. 58 ¶ 22; Doc. 70 ¶ 22.)

DO 812 covers the Inmate Maximum Custody and Management Incentive System, which is a system that requires inmates in Maximum Custody to work through a program that utilizes a step incentive system and provides the opportunity to participate in jobs, programs, and other out-of-cell activities. (Doc. 58 ¶ 23; Doc. 70 ¶ 23.) Based on behavior and programming, inmates may progress from controlled-based-housing to open, privilege-based housing, where movement outside a cell is without restraint equipment. (Doc. 58 ¶ 23; Doc. 70 ¶ 23.) The Program Team reviews inmates monthly to decide step movement, housing, and review program needs and completion; during reviews, the Program Team determine the inmate's step level with Step I being the most restrictive and Step III being the least restrictive. (Doc. 58 ¶ 24; Doc. 70 ¶ 24.) Inmates in the Browning Unit can be eligible for Step II after a minimum of thirty days and can be eligible for Step III after a minimum of thirty days in Step II. (Doc. 58 ¶ 25; Doc. 70 ¶ 25.) Inmates in Step III at Browning receive: (1) recreation in three, 2.5 hour blocks per week in the chute enclosure, to include one time per week in the 10 x 10 enclosure, (2) three, two-hour, non-contact visits per week, (3) three fifteen minute phone calls per week, and (4) are allowed to spend up to $100 per week at the inmate store. (Doc. 58 ¶ 26; Doc. 70 ¶ 26.)

**B.     Plaintiff's Removal from the Step-Down Program**

Plaintiff has been a validated STG member of the Warrior Society since October 22, 2014. (Doc. 58 ¶ 27; Doc. 70 ¶ 27.) Plaintiff participated in and was removed from the Step-Down Program prior to his removal in 2018. (Doc. 58 ¶ 28; Doc. 70 ¶ 28.) On February 1, 2018, Plaintiff was re-instated at Phase III of the Step-Down Program based on the recommendation of the STG Validation Hearing Committee. (Doc. 58 ¶ 29; Doc. 58-1 at 32.) On April 12, 2018, Plaintiff arrived at ASPC-Florence Central Unit to begin Phase IV of the Step-Down Program. (Doc. 58 ¶ 30; Doc. 70 ¶ 30.)

On April 13, 2018, Central Unit SSU conducted a search of Plaintiff's property and discovered three documents concealed in Plaintiff's legal documents: (1) a calendar code

pertaining to the STG-specific Warrior Society with the name and ADC number of a Warrior Society validated inmate, (2) a roster pertaining to the STG-specific Warrior Society of validated members housed in Wing IV of ASPC-Eyman, Browning Unit, and (3) a "micro note" authored by another STG (Dine Pride) validated inmate directed to another inmate in the Step-Down Program. (Doc. 58 ¶ 32.) Plaintiff denies possessing, knowing about, or facilitating the transport of STG-specific documents and objects to the "characterization of the purported documents." (Doc. 70 ¶ 32.)

SSU Sergeant Belt wrote a memorandum documenting finding the documents in Plaintiff's cell and concluded that they demonstrated clear evidence that Plaintiff violated DO 806.08 § 1.2.2.2.4, which prohibits any participation in STG activity for inmates participating the Step-Down program. (Doc. 58 ¶ 33.) Sergeant Belt determined that Plaintiff was using the documents to facilitate communication between STG members housed at ASPC-Eyman Browning Unit and ASPC-Florence Central Unit. (*Id.*) Defendant Montano, Deputy Warden of the Central Unit, reviewed the memorandum and determined there was sufficient evidence to remove Plaintiff from the Step-Down Program and Plaintiff was transferred to Cell Block Kasson pending his move back to ASPC-Eyman, Browning Unit. (*Id.* ¶ 34.)

Plaintiff was provided notice of his hearing regarding proposed placement in maximum custody on April 23, 2018. (Doc. 58 ¶ 35.) Plaintiff asserts that when he asked Belt why he was being terminated from the Step Down Program, Belt responded that his "higher-ups wanted Plaintiff off the yard and jailhouse lawyers weren't welcomed on his unit," but Belt refused to tell Plaintiff who his "higher-ups" were. (Doc. 70 ¶ 47.) On April 25, 2018, following the maximum custody placement hearing, it was recommended that Plaintiff be placed in maximum custody due to his status as a validated STG member. (*Id.* ¶ 36; Doc. 70 ¶ 36.)

Plaintiff filed an appeal regarding his placement in maximum custody and Defendant Crabtree responded to the appeal and informed Plaintiff that his placement was correct because he was a validated STG member and that his placement was determined

due to "security threat group documented activity found in your belongings during a search by SSU officers on April 13, 2018." (Doc. 58 ¶ 37; Doc. 70 ¶ 37.) Defendant Crabtree did not have the authority to address, question, or change the issues surrounding Plaintiff's removal from the Step-Down Program. (Doc. 58 ¶ 38; Doc. 70 ¶ 38.) Plaintiff filed a formal grievance regarding his placement in maximum custody and Defendant Days responded and informed him that his removal from the Step-Down Program was appropriate because DO 806 does not require inmates in Phases I-IV of the Step-Down Program to receive a revocation hearing prior to being removed from the program. (Doc. 58 ¶ 39; Doc. 70 ¶ 39.)

**IV. Discussion**

Defendants argue that they are entitled to summary judgment on Plaintiff's Due Process claims because participation in the Step-Down Program is not a protected liberty interest, ADC's validation procedure complies with Due Process, and Defendants Ryan, Crabtree, and Days did not participate in Plaintiff's removal from the Step-Down Program. Defendants also assert that they are entitled to qualified immunity because the law is not clearly established that due process is required for an alternative program that allows inmates to move out of maximum custody like Arizona's Step-Down Program. Defendants further argue that Belt and Montano did not retaliate against Plaintiff.

**A. Due Process**

Plaintiff asserts that his due process rights were violated when he was removed from the Step-Down Program because he never received "any kind of notification of what is being used to classify him as an 'active STG member.'" (Doc. 55 at 4.)

**1. Ryan**

Plaintiff asserts, that as Director of the ADC, Ryan exercises administrative control of and responsibility for the ADC and "the way Ryan chooses to interpret those responsibilities and administrative controls gives Plaintiff no procedural or even minimum due process of any kind while being subject to a significant deprivation of liberty." (Doc.

55 at 8.) Plaintiff appears to argue both that DO 806 is unconstitutional and that prison officials did not abide by DO 806. (*See generally* Doc. 55.)

Plaintiff's allegations and arguments regarding Defendant Ryan are conclusory and the Court cannot ascertain the exact basis of Plaintiff's claim against Ryan. The facts in the record before the Court do not show that Ryan was involved in the decision to remove Plaintiff from the Step-Down Program, and Plaintiff has not shown that the process of removing him was attributable to any unconstitutional policies, practices, or customs that could be attributed to Defendant Ryan. Accordingly, Defendants' Motion for Summary Judgment will be granted as to Plaintiff's due process claim against Defendant Ryan. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.").

### 2. Crabtree

Plaintiff asserts that Crabtree did not meaningfully review his classification, but instead responded to a grievance stating that Plaintiff was correctly classified to maximum custody due to the serious nature of Plaintiff's participation in a security threat group. (Doc. 55 at 6-7.) The facts in the record before the Courts show that Defendant Crabtree did not determine that Plaintiff would be removed from the Step-Down Program and had no authority to alter that decision because Plaintiff had not renounced and debriefed or completed the Step-Down Program. Plaintiff has not introduced any evidence controverting these facts. Accordingly, summary judgment will be granted in favor of Defendant Crabtree as to Plaintiff's due process claim against her.

### 3. Days

Defendant Days responded to Plaintiff's formal grievance and informed him that his removal from the Step-Down Program was appropriate because DO 806 does not require inmates in Phases I-IV of the Step-Down Program to receive a revocation hearing prior to being removed from the program. Plaintiff asserts that this response "perpetuat[ed] the denial of providing a brief summary of the factual basis for the classification review,

and condoning the denial of Plaintiff's opportunity to rebut whatever evidence is used to classify him as an 'active STG member.'" (Doc. 55 at 5.) Plaintiff further alleges that he later spoke to Days about his situation and she told him she would look into it and get back to him, but she never did. (Doc. 55 at 6.)

The record before the Court shows that Plaintiff was in Phase IV of the Step-Down Program when he was removed. The version of DO 806 in effect at that time did not require ADC staff to provide revocation hearings for inmates removed from Phases I-IV of the Step-Down Program, and because Plaintiff was in Phase IV of the Step-Down Program, Days had no authority to order a revocation hearing for his removal. Days was not involved in the determination to remove Plaintiff from the Step-Down Program and did not have authority to alter that decision. Plaintiff has not introduced any evidence controverting these facts. Accordingly, summary judgment will be granted in favor of Defendant Days as to Plaintiff's due process claim against her.

**4. Montano**

Deputy Warden Montano reviewed the memorandum detailing the alleged STG-related documents found in Plaintiff's cell and determined there was sufficient evidence to remove Plaintiff from the Step-Down Program. As such, the record before the Court shows that Montano was personally involved in the decision to remove Plaintiff from the Step-Down Program.

The Due Process Clause of the Fourteenth Amendment prohibits the states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To determine whether a procedural due process violation has occurred, a court engages in a two-step analysis. *See Sandin v. Conner*, 515 U.S. 472, 485-87 (1995). First, a court looks to whether the person possesses a constitutionally cognizable liberty interest with which the state has interfered. *Id.* Second, if the state has interfered with a liberty interest, a court looks to whether this interference was accompanied by sufficient procedural and evidentiary safeguards. *See id.*

Here, due to his status status as an STG member, Plaintiff has been classified into

maximum custody. It is well-settled that placement in maximum security segregation units implicates a liberty interest requiring due process protections. *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005). Under these circumstances, due process requires (1) upon initial placement in segregation, the inmate receives notice of the factual basis for the segregation and an opportunity to be heard; (2) some evidence to support the decision; and (3) review of the inmate's confinement status. *Id.* at 225-26.

Plaintiff's initial placement into maximum security and whether there was evidence to support that decision are not at issue in this action because Plaintiff does not contest his initial classification as a member of a security threat group. Accordingly, the Court must determine if the periodic review of Plaintiff's confinement status satisfies due process. To determine whether the periodic review afforded Plaintiff conforms to due process requirements, the Court must consider "[1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [3] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Under these circumstances, the Ninth Circuit Court of Appeals has indicated that annual reviews of the inmate's confinement status, by themselves, are insufficient. *Toussaint v. McCarthy*, 801 F.2d 1080, 1101 (9th Cir.1986), *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472, (1995)); *Hernandez v. Schriro*, No. 08-15493, 357 F. App'x 747, 749 (9th Cir. 2009)

This Court has previously held that ADC's periodic review, combined with the ability to debrief at any time, satisfies due process. *Hernandez v. Schriro*, No. CV 05-2853-PHX-DGC (JJM), 2011 WL 2910710, at *8-9 (D. Ariz. 2011); *see Mendez v. Ryan*, No. CV-12-0271-PHX-RCB (MHB), 2013 WL 6408389, at *8 (D. Ariz. 2013); *Standley v. Ryan*, No CV 10-1867-PHX-DGC (ECV), 2012 WL 3288728, at *9-10 (D. Ariz. 2012);

*Faulkner v. Ryan*, No. CV 10-2441-PHX-SMM (JFM), 2012 WL 407452, at *9-10 (D. Ariz. 2012).

While in those cases Plaintiff also had the ability to participate in the Step-Down Program, the Courts' reasoning that the ability to debrief at any time and non-pretextual annual reviews satisfy the test articulated in *Mathews* applies equally. Plaintiff makes no argument as to why the periodic reviews combined with debriefing are inadequate and makes no argument that debriefing is somehow unavailable to him. Plaintiff's entire argument is that he was entitled to procedural protections when terminated from the Step-Down Program, but Defendants argue that the Step-Down Program itself creates no liberty interest.

Indeed, where, as here, Plaintiff's placement in maximum custody complies with the Due Process Clause and the periodic review complies with the Due Process Clause, the Court is unable to find that the Step-Down Program creates an independent liberty interest. The Step-Down Program is a program that is voluntarily administered by the ADC and is not necessary for the ADC to comply with Due Process. As such, as long as Plaintiff is afforded the process he is due for his placement in maximum custody, the Court cannot find that he is entitled to greater protections simply because the ADC voluntarily offers a program that would create another way for Plaintiff to be removed from maximum custody. *See Sandin*, 515 U.S. at 481-84 (a court determines whether a liberty interest is created by a state prison regulation or policy by focusing on the nature of the deprivation it effects); *James v. Rowlands*, 606 F.3d 646, 657 (9th Cir. 2010) ("[W]hen a state establishes procedures to protect a liberty interest that arises from the Constitution itself[,] . . . the state does not thereby create a new constitutional right to those procedures themselves, and non-compliance with those procedures does not necessarily violate the Due Process Clause. . . . Rather, the Due Process Clause itself determines what process is due before the state may deprive someone of a protected liberty interest.").

Here, while Plaintiff's placement in maximum custody constitutes a deprivation, Plaintiff has been afforded due process in that deprivation through yearly reviews and the

opportunity to debrief. While the availability of the Step-Down Program gives Plaintiff another opportunity to be released from maximum custody, that opportunity is not necessary for Plaintiff to be afforded his due process. Accordingly, there is no evidence of a due process violation in this record, and summary judgment will be granted in favor of Defendant Montano as to Plaintiff's due process claim.

### B. Retaliation

Plaintiff asserts that he was removed from the Step-Down Program because at the time of his removal, he had a lawsuit pending before the United States Court of Appeals for the Ninth Circuit. Plaintiff's claim in that prior lawsuit was that Validation Committee Chair Diaz, ASPC-Winslow/Kaibab Unit Deputy Warden Pruett, and ASPC-Eyman/Rynning Unit Associate Deputy Warden Rode retaliated against Plaintiff for filing grievances by validating Plaintiff as a gang member. (*Johnson v. Bendel*, No. CV 15-00670-PHX-GMS (D. Ariz.), Doc. 159-1 at 2, Doc. 139 at 5.).

"[A] viable claim of First Amendment retaliation entails five basic elements: (1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

#### 1. Protected Conduct

Courts have determined that protected conduct in the prison context includes filing lawsuits. *Rhodes*, 408 F.3d at 567. Here, Plaintiff alleges that Defendants Belt and Montano retaliated against him for filing the previous lawsuit against Diaz, Pruett, and Rode, and has thus sufficiently alleged that he was engaged in protected conduct.

#### 2. Causation and Legitimate Correctional Goal

The evidence in the record before the Court does not support Plaintiff's assertion that Defendants Belt and Montano removed him from the Step-Down Program because of his protected conduct. "To prevail on a retaliation claim, a plaintiff must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct."

*Brodheim v. Cry*, 584 F.3d 1262 (9th Cir. 2009) (internal quotation marks and citation omitted). Plaintiff speculates that Belt's comment that his "higher-ups" wanted Plaintiff off the yard because they "don't like jailhouse lawyers" means that he was being retaliated against for filing his previous action. Plaintiff provides no evidence regarding who Belt's superiors were or their alleged involvement in removing him from the Step-Down Program. Montano avers that he had no knowledge of Plaintiff's previous litigation (Doc. 61-1 at 36), and Plaintiff's previous litigation was not against any Defendants to this action and was filed years prior to the alleged events that gave rise to Plaintiff's claim in this action. Plaintiff's speculation about the alleged meaning of Belt's alleged comment is insufficient to create a disputed issue of material fact that any Defendant was aware of the previous action. *See Soremekun*, 509 F.3d at 984.

Even if Defendants knew about the previous action, Plaintiff has failed to show that the previous action was a substantial or motivating factor behind his removal from the Step-Down Program. Rather, the evidence shows that SSU officers discovered evidence in Plaintiff's cell and brought that evidence to Belt, who prepared a memorandum detailing how the evidence found was allegedly related to a security threat group, and after reviewing the memorandum, Montano determined that Plaintiff should be removed from the Step-Down Program due to his alleged continued involvement in a security threat group. Although Plaintiff denies any knowledge of the evidence found in his cell, Plaintiff presents no evidence that Defendants Belt and Montano were involved in any impropriety with regard to how the evidence got to Plaintiff's cell. Rather, the record before the Court shows that Belt and Montano relied on the evidence allegedly found in Plaintiff's cell when determining that Plaintiff should be removed from the Step-Down Program. Because Belt and Montano relied on this evidence to remove Plaintiff from the Step-Down Program, Plaintiff has failed to show that filing a prior lawsuit was the substantial or motivating factor behind his removal from the Step-Down Program.

As such, Plaintiff has failed to demonstrate that there is a disputed issue of material fact that the previous action was a substantial or motivating factor behind Plaintiff's

removal from the Step-Down Program or that the removal did not reasonably advance a legitimate correctional goal.

For all of the foregoing reasons, Defendants' Motion for Summary Judgment will be granted.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Summary Judgment (Doc. 55) and Defendants' Motion for Summary Judgment (Doc. 57).

(2) Defendants' Motion for Summary Judgment (Doc. 57) is **granted**, and the action is terminated with prejudice.

(3) Plaintiff's Motion for Summary Judgment (Doc. 55) is **denied**.

(4) The Clerk of Court must enter judgment accordingly.

Dated this 13th day of February, 2020.

Michael T. Liburdi
United States District Judge